**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                                    CRIMINAL  ACTION  NO. 3:09-00194

CARL EVAN TOOLEY II

**MEMORANDUM OPINION AND ORDER**

Pending is the defendant's Motion to Dismiss (Doc. 20).  For the reasons explained below, the motion is **DENIED**.

**Background**

In December 2008, the defendant's girlfriend, Adrianne Beasley, purchased a 12-gauge, pump-action shotgun to give him as a Christmas gift.  In affidavit, Ms. Beasley explains that she and the defendant, Mr. Tooley,  had previously spoken about getting a gun for protection.  They lived in a dangerous neighborhood where drug activity was prevalent and break-ins common.   When Ms. Beasley purchased the gun, she registered it in her own name ("Semple" at the time).   Ms. Beasley states that shortly after receiving the gun, Mr. Tooley took it to shoot skeet once at a target range and thereafter kept it in the house for defense of himself, Ms. Beasley, and the home.

In March 2009, the defendant and Ms. Beasley separated.  As Mr. Tooley began to pack his things, Ms. Beasley realized that he would be taking the gun and that it was still registered in her name.  Not wanting to be connected to the gun when she no longer had any control over it, she called the  local and state police departments and asked how to change its registration.  The state

police department told her to visit a registered firearms dealer, and recommended Mack and Dave's Department store.

That same morning, Ms. Beasley and the defendant went to Mack and Dave's to register the gun in Mr. Tooley's name.  They were handed a form from the Bureau of Alcohol Tobacco and Firearms ("ATF"), ATF Form 4473, and told by an employee that "you have to answer yes to the first question and no to all the others" in order to transfer the gun.  The form was several pages long, but the defendant and Ms. Beasley quickly completed it and handed it back to the Mack and Dave's employee.  One of the questions on the form read as follows: "11. I.  have you ever been convicted in any court of a misdemeanor crime of domestic violence?  (*See Instructions for Question 11.I*)."  The defendant checked "No" in the box next to this question.

Contrary to his answer to question 11.I, the defendant had been convicted of misdemeanor crimes of domestic violence on three separate occasions.  He was first convicted on or about June 3, 2002, in Lawrence County, Ohio Municipal Court, for Domestic Violence in violation of Ohio Revised Code § 2919.25.[1]  He was convicted in the Lawrence County Municipal Court a second

---

[1]Oh. Rev. Code § 2919.25 provides in relevant part:

> (A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.

> (B) No person shall recklessly cause serious physical harm to a family or household member.

> (C) No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member.

(continued...)

-2-

time for the same charge on August 5, 2002. His third and final conviction was in the Magistrate Court of Cabell County, West Virginia, for Domestic Battery, Second Offense in violation of W.Va. Code § 61-2-28 on February 11, 2004.[2,3] The defendant's former girlfriend, Ms. Misty Dawn Curtis, was the victim in each of the crimes. There is no evidence that a firearm was involved in any incident.

Information from the defendant's ATF form was transmitted to the FBI's National Instant Criminal Background Check System ("NICS"). The response came back to Mack and Dave's "delayed," which meant that the shotgun could be transferred to the defendant on March 14, 2009. The defendant and Ms. Beasley left Mack and Dave's and the defendant returned on his own to retrieve the shotgun on March 19, 2009. Three days later, on March 22, 2009, defendant pawned

---

[1](...continued)

    (D) Whoever violates this section is guilty of domestic violence . . . .

[2]W.Va. Code § 61-2-28 provides in part:

    (a) *Domestic battery* – Any person who unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member or unlawfully and intentionally causes physical harm to his or her family or household member, is guilty of a misdemeanor. . . .

    (c) *Second offense* – . . . A person convicted of a violation of subsection (a) . . . after having been previously convicted of a violation of subsection (a) or (b) [domestic assault]. . . is guilty of a misdemeanor . . .

[3]Count Two of the indictment includes only two of the defendant's prior domestic violence convictions: the June 3, 2002 charge, and the February 11, 2004 charge.

the gun for $60 to FFL Gold & Pawn.  According to the ticket, the defendant was eligible to retrieve the shotgun on April 21, 2009.

On March 25, 2009, the NICS issued a "delayed denial" for the transfer of the shotgun to Mr. Tooley, based on the defendant's February 11, 2004 conviction for domestic battery.  On March 26, 2009, the case was referred to the ATF in Charleston for investigation and retrieval of the shotgun.

ATF Special Agent Jason C. Lawler contacted the defendant by phone on April 7, 2009. Agent Lawler informed the defendant that he was not supposed to possess a firearm because of his prior misdemeanor domestic violence conviction.  The defendant told Lawler that he understood and explained that he had pawned the shotgun.  The next day, April 8, 2009, Agent Lawler recovered the shotgun from FFL Gold & Pawn in Huntington.

ATF determined that the firearm had traveled in interstate commerce prior to being possessed by the defendant.  He was indicted on August 26, 2009 on two counts.  The pending charges include: Count I – making false statements in records required to be kept by federally licensed firearms dealers (the ATF form 4473 completed by the defendant on March 10, 2009 at Mack and Dave's); and, Count II – possessing a firearm after having been previously convicted of a misdemeanor crime of domestic violence – in violation of 18 U.S.C. § 924(a)(1)(A) and 922(g)(9).  The defendant moves to dismiss his indictment on grounds that it is unconstitutional under the Second Amendment.  The challenge is largely based on the U.S. Supreme Court's decision in *District of Columbia v. Heller*, wherein the Court, for the first time, recognized the Second Amendment Right to "keep and bear arms" as an individual right; rather than a collective right relevant only to service in a militia.  128 S.Ct. 2783 (2008).

## Standard of Review

The Court may, at any time during the pendency of a case, hear a claim that an indictment "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). An indictment is defective if it alleges a violation of an unconstitutional statute, or if the "allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004); *see also*, *In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883). A court must dismiss an indictment it finds to be defective.

## Analysis

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend 2. For many years, the prevailing thought in federal courts was that this right was a collective right connected with service in a state organized militia (or an individual right which could only be exercised in connection with militia service). *See Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir.1995); *United States v. Warin,* 530 F.2d 103, 106 (6th Cir.1976); *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir.1999); *Hickman v. Block,* 81 F.3d 98, 99 (9th Cir.1996); *Cases v. United States*, 131 F.2d 916, 923 (1st Cir.1942); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir.1996); *United States v. Hale,* 978 F.2d 1016 (8th Cir.1992); *United States v. Oakes*, 564 F.2d 384 (10th Cir.1977); *United States v. Wright,* 117 F.3d 1265 (11th Cir.1997); *but cf. United States v. Emerson*, 270 F.3d 203**,** 260 ("We reject the collective rights and sophisticated collective rights models for interpreting the Second Amendment. We hold . . .that it

protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms. . .").

These militia-dependant interpretations of the Second Amendment were soundly rejected by the Supreme Court in *Heller*. 128 S.Ct. 2783 (2008).   The question before the *Heller* court was the constitutionality of a District of Columbia statute that "generally prohibit[ed] the possession of handguns" by all persons within the District, save a few narrowly defined exceptions. *Id.* at 2788. It also prohibited lawful gun owners from keeping their firearms loaded or effectively "functional" within the home.  *Id.*  The outcome of the case depended upon whether the Court interpreted the Second Amendment as a right which could only be exercised in connection with a militia (in which case the statute would be lawful) or whether the right was broader and protected some individual right to keep firearms for a citizen's own use – unconnected with any militia (in which case the broad D.C. gun ban would likely fail to pass constitutional muster).   In reviewing the Second Amendment, the Court divided it into its operative clause – "the right of the people to keep and bear Arms, shall not be infringed," and its prefatory clause – "[a] well regulated Militia, being necessary to the security of a free State."  *Id.* at 2789.  After conducting a historical inquiry into the meaning of the statute's text, the Court determined that the operative clause did encompass an individual citizen's right to keep and bear arms apart from militia service and that this phrase was not to be limited by the prefatory clause. *Id.* at 2801-02. The prefatory clause, the Court explained, announces a purpose for enacting the amendment but does not define the right protected.  *Id.*  In fact, the Court found that the "core" of the Second Amendment protection was, not participation in a militia, but protecting an interest in "the right of law-abiding, responsible citizens to use arms in the defense of hearth and home."  *Id.* at 2818, 2821.

-6-

The Court declined to establish a particular level of constitutional scrutiny for review of the statute, because "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." *Id.* At 2817-18 (internal citations omitted).  It did, however, explicitly reject two suggested levels of scrutiny: rational basis review and an "interest-balancing approach" suggested by Justice Breyer in dissent. *Id.* at 2818 n. 27 ("If all that was required to overcome the right to keep and bear arms was rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.); *id.* at 2821 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach.").  The Court also signaled that its decision should not be over-read by lower courts as invalidating all existing firearm regulation.  *Id.* at 2816-17.  It cautioned,

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.*  And further explained in a footnote, "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at n. 26.

Predictably, and despite the Court's call for caution, challenges to firearm regulations of all kinds immediately began to crop up across the country. As a result of the Court's list of "presumptively lawful regulatory measures" some of these challenges were dealt with relatively

simply.  *See e.g. United States v. Anderson,* 559 F.3d 348, 352 (5th Cir. 2009) (upholding ban on

felons in possession); *United States v. Brunson*, 292 Fed. Appx. 259, *261 (4th Cir. Sept. 11, 2008)

(unpublished) (upholding ban on felons in possession); *United States v. McRobie,* 2009 WL 82715

at *1 (4th Cir. Jan. 14, 2009) (unpublished) (upholding ban on mentally ill possessing firearms).

Challenges to other statutes have proven more complicated.  Of concern in this case is the statute

prohibiting not only felons but those convicted of misdemeanor crimes of domestic violence from

possessing a firearm: 18 U.S.C. § 922(g)(9).  This statute provides, "[i]t shall be unlawful for any

person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to

. . . possess . . . any firearm."

     More than a handful of courts have found 18 U.S.C. § 922(g)(9) constitutional simply

because it is "similar enough" to the presumptively lawful restriction on firearms possessed by

convicted felons, specifically mentioned by the Supreme Court.  A few, however, including a

growing number in this circuit, have found such an analysis insufficient.  *See e.g., United States v.*

*Brown*, No. 3:09-cr-339, slip op. (E.D. Va. May 27, 2010).  This is largely due to an unpublished

(an hence non-binding) opinion of the Fourth Circuit Court of Appeals in *United States v. Chester,*

2010 WL 675261 (4th Cir. Feb. 23, 2010) and a Seventh Circuit Court of Appeals decision (now

vacated pending *en banc* review) from which the Fourth Circuit decision took much of its reasoning:

*United States v. Skoien,* 587 F.3d 803 (7th Cir. 2009).  Although neither of these opinions is binding

(and in fact *Skoien* is no longer valid precedent in its own circuit), this Court finds their reasoning

persuasive.  In this Court's view the Supreme Court's dicta in *Heller* declaring certain firearm

regulations "presumptively lawful" should be read narrowly, to simply signal that the decision is not

a complete ban on all firearm regulations and that not all Second Amendment analyses should begin

with a presumption of unconstitutionality.  While courts may be free to "presume" that many regulations (including those listed) will ultimately be declared lawful, it does not eliminate the need to conduct a careful constitutional analysis.  The Second Amendment, after all, is now clearly an important individual right, which should not be given short shrift.  Having explained its general view on *Heller*, the Court now turns to the cases it finds persuasive in their interpretation of that precedent.

*Skoien* was the first case to reject an argument that 18 U.S.C. § 922(g)(9) was constitutional simply because it was analogous to felon-in-possession laws labeled "presumptively lawful" by the Supreme Court in *Heller*.  It did so firmly, stating in its second paragraph, "[t]he government has approached this case as though all it had to do to defend the constitutionality of § 922(g)(9) is invoke *Heller's* language about "presumptively lawful" gun regulations – notably felon-dispossesion laws. Not so."  *Skoien,* 587 F.3d 803.  The *Skoien* court determined two guiding principles from the Supreme Court in scrutinizing the validity of a statute regulating firearms.

> First some gun laws will be valid because they regulate conduct that falls outside the terms of the right as publicly understood when the Bill of Rights was ratified.  If the government can establish this, then the analysis need go no further.  If, however, a law regulates conduct *within* the scope of the right, then the law will be valid (or not) depending on the government's ability to satisfy whatever level of means-end scrutiny is held to apply; the degree of fit required between the means and the end will depend on how closely the law comes to the core of the right and the severity of the laws burden on the right.

*Id.* at 808-09 (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009)).  This test was based on language from *Heller* that the opinion should not cast doubt on the validity of

"longstanding prohibitions on the possession of firearms," *Heller,* 128 S.Ct. at 2816-17, and that the "core" of the right was that of "law-abiding, responsible citizens to use arms in the defense of hearth and home." *Id.* at 2821. In choosing this approach, the *Skoien* court proposed a Second Amendment analysis similar to that used in First Amendment cases. *Id.* at 812-14. Regulations which infringe speech more valued in our understanding of the protections recognized by the First Amendment – such as political speech – are subject to more strict scrutiny than regulations which infringe lesser regarded speech – such as commercial speech. *Id.* at 813. The court went on to determine the defendant, Skoien, as a prior domestic violence misdemeanant, a hunter, and a person who kept his gun in his truck, was "several steps removed from the core constitutional right identified in *Heller,*" because he was not law-abiding, was not using his gun for self-defense, and was not keeping it within his home. *Id.* at 812. The court thus determined that intermediate scrutiny, which requires the government to show, through an "exceedingly persuasive justification", *id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)), that § 922(g) served an important governmental interest using means substantially related to the achievement thereof. The Seventh Circuit Court of Appeals found that the government could not satisfy intermediate scrutiny on the existing record and thus remanded the case to the district court for further review. *Id.*

Similar to the Seventh Circuit, the Fourth Circuit Court of Appeals concluded that justifying § 922(g)(9) by analogy to *Heller's* list of presumptively lawful regulations was inappropriate. *United States v. Chester*, 2010 WL 675261 at *1 (4th Cir. Feb. 23, 2010) (unpublished) ("We agree with the Seventh Circuit decision in *United States v. Skoien*, 587 F.3d 803, 808 (7th Cir. 2009), insofar as it held that challenges to firearm regulations under the Second Amendment must be individually analyzed because such regulations restrict the exercise of a constitutional entitlement.").

Interpreting *Heller,* the *Chester* panel noted, "it seems clear that cases that fall outside the specific exceptions in *Heller* warrant independent constitutional scrutiny." *Id.* at *4.  As did the *Skoien* court, the *Chester* panel remanded the case to the district court for further development of the record after it rejected the analogy approach employed by the lower court.  The panel issued limited instructions as guidance, "[t]he district court should consider and interpret the historical analysis from *Heller*, although it is not bound by the threshold test articulated in *Skoien*.  It should also identify, justify, and apply an appropriate level of scrutiny." *Id.* at *5.  While refusing to articulate a standard of scrutiny or engage in a detailed historical analysis, the *Chester* panel did signal that, "it is clear that Chester was not 'law-abiding' and is therefore at least one step 'removed from the core constitutional right.'" *Id.* at *6.

       Although it is not bound by either *Skoien* (a Seventh Circuit opinion, which has been vacated upon grant of an *en banc* review) or *Chester* (an unpublished opinion),this Court finds the reasoning in these opinions sound.  To determine an appropriate level of review, this Court will engage in a historical analysis of the Second Amendment as it would apply to 18 U.S.C. § 922(g)(9) and Mr. Tooley's circumstances.[4]  This review could result in three possibilities: 1) a finding that a restriction of firearms under § 922(g)(9), as applied to Mr. Tooley, is completely outside the historical protections offered by the Second Amendment, in which case the statute would be constitutional; *see e.g. United States v. Brown*, No. 3:09-cr-339, slip op. (E.D. Va. May 27, 2010); 2) a finding that 18 U.S.C. § 922(g)(9), as applied to Mr. Tooley, is within the "core" of the Second

---

       [4]The historical treatment of the regulated conduct guides the determination of the extent to which a core right, or something less, is implicated. *Heller*, at page 2821, points out that historical justifications for the "presumptively lawful regulatory measures" would be still considered if and when those statutes are challenged.

Amendment right "to keep and bear arms" – in which case the restriction would most likely be subject to exacting scrutiny; or 3) a finding that while the Second Amendment extends to some of those affected by § 922(g)(9), including Mr. Tooley, but that its protections are outside the "core" of the right – in which case lesser review than strict scrutiny would most likely be appropriate. This determination of varying degrees of protection, based upon a historical understanding of a constitutional right, is consistent with the approaches taken in *Skoien* and *Chester*, is based upon plain language in *Heller*, and is consistent with the approach taken by courts in analyzing protections for freedom of speech under the First Amendment.[5]

## I.    Firearm Regulation and the Second Amendment – A Historical Understanding

In undertaking a historical review of firearm regulation and the Second Amendment, this Court takes its cue from the Supreme Court's decision in *Heller*. The Court in *Heller* clearly viewed the Second Amendment as codifying an important protection for an existing right, not as granting a new right. 128 S.Ct. at 2797 ("it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right") (emphasis in original). Pre-Second Amendment protections of the right existing in England and the Colonies at the time of the

---

[5] The majority in *Heller* appears to have anticipated that analysis of regulations restricting Second Amendment freedoms would take an approach similar to the analysis of regulations restricting the freedom of speech under the First Amendment. Writing for the Court, Justice Scalia analogized First and Second Amendment protections no less than thirteen times, far more than any other provision of the Bill of Rights. *Heller,* 128 S.Ct. at 2790, 2791, 2792, 2797, 2799, 2803, 2805, 2811-12, 2813 n. 23, 2817-18, n. 27, 2821, 2821-22. Moreover, the Court signaled that it would be amenable to differing levels of protection when it defined not uniform Second Amendment protection, but delineated a "core" of the constitutional right – strongly implying that there exist behaviors to which the Second Amendment extends but where it offers more limited protections.

founding are therefore critical to understand the scope of the right.  These sources are not simply suggestions of how the Second Amendment should look, or might look if drafted pursuant to a particular entity's view.  Rather, they grant insight into the contours and common understanding of a right which existed independently of its enactment in the Bill of Rights.

A.     *Domestic Abusers Would Not Have Been Specifically Prohibited From Owning Firearms in the Founding Era*

It is important to recognize at the outset that commission of domestic violence likely did not place one outside the scope of the Second Amendment as it was understood at the founding.  However regrettable it may seem today, domestic violence was not a separate criminal offense and was probably not even viewed as especially problematic in most circles during the Founding Era.  *See e.g. State v. Rhodes*, 61 N.C. (Phil.) 453, 450 (1868) (per curiam) ("We will not inflict upon society the greater evil of raising the curtain upon domestic privacy, to punish the lesser evil of trifling violence."); *Giles v. California*, 128 S.Ct. 2678 (2008) (Breyer, J. dissenting) ("200 years ago, it might have been seen as futile for women to hale their abusers before a Marian magistrate").  It is impossible to say then that domestic violence misdemeanants were completely outside the original understanding of the Second Amendment and no level of constitutional scrutiny is due 18 U.S.C. § 922(g)(9).  Our analysis, however, does not end here.

Domestic violence  has long since been prohibited as a crime in the United States.  Moreover, it is recognized as a crime of violence.  18 U.S.C. § 3156(a)(4) ("the term "crime of violence" means – (A) an offense that has an element of the offense the use, or threatened use of physical force against the person or property of another").  Because of this, it is important to look beyond the simple question of whether the founders would have prohibited a domestic abuser from possessing and using a firearm.  It is important to gain an understanding of the type of restrictions

-13-

recognized for gun possession and particularly whether those restrictions extended to those who had been convicted of a crime or were viewed as violent or dangerous.  Only then may the Court determine whether § 922(g)(9)'s restriction on Mr. Tooley affects a "core" constitutional right or one closer to the periphery of Second Amendment protection, and thus subject to a lesser standard of review.

   B.   *Historical Limitations of the Right to Keep and Bear Arms*

   The English right to possess firearms was not unlimited.  *Heller* identified the 1689 English Declaration of Rights as the "predecessor of our Second Amendment." 128 S.Ct. at 2798.  That document provides, "the subjects which are Protestants may have arms for their defense suitable to their conditions as allowed by law."  *See* Kenneth A. Klukowski, *Armed by Right:  The Emerging Jurisprudence of the Second Amendment*, 18 Geo. Mason U. Civ. Rts. L.J. 167, n. 56 (2008) (quoting 1 W. & M., C 2, § 7, in 3 Eng. Stat. at Large 441 (1689)).  Even on its face, this right is subject to certain restrictions.  The right "like all written English rights . . . was held only against the Crown, not Parliament."  *Heller*, 128 S.Ct. at 2798.  Thus the right guaranteed to citizens "suitable to their conditions as allowed by law," was subject to restrictions enacted by Parliament, although not by the King.  Moreover, the right was explicitly reserved only for "Protestants" and, importantly, not for Catholics.  This had much to do with the fear Protestants held about Catholics after the reign of King James II.  Joyce Lee Malcolm, <u>To Keep and Bear Arms</u> 19-53, 94-164 (1994); *Heller*, 128 S.Ct. at 2798-99.

   The English right was also subject to other restrictions which, though not written into the Declaration of Rights, would have been understood.  Most prominently, the Declaration of Rights did not repeal the 1662 Militia Act.  Thus, lieutenants of the militia retained the authority to disarm

-14-

"any person or persons" judged "dangerous to the Peace of the Kingdome."  Charles, *"Arms for Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 365-66 (2009) (quoting13 & 14 Car. 2, c. 3 § 1 (1662) (Eng.)).  Although the perceived misuse of this Act partially motivated the adoption of the right to firearms in the Declaration of Rights, efforts to review the Militia Act were "a failure," and the Act "was to remain in force with only insignificant changes for many years to come."  Malcom, *supra*, at 123; *accord*, Charles *supra*, 57 Clev. St. L. Rev. at 373, 376, 382-83, 405.  As allowed by the Militia Act, the authority of these lieutenants was authorized (and employed) not only against Catholic "papists" but against any who were viewed as "disaffected and dangerous."  Charles, *supra* 57 Clev. St. L. Rev. at 376-78.

Criminals in England could also be, and often were, disarmed.  Malcolm includes at least one example of firearm restrictions for a misdemeanor as a Nottinghamshire labourer was bound "not to shoot again for seven years" after a misdemeanor conviction for "shooting with hailshot."  Malcolm, *supra* at 10.  English common law also provided for the forfeiture of all property – and frequently death – for crimes designated as felonies.  5 William Blackstone, <u>Blackstone, Commentaries on the Laws of England</u>, 95 (1803) (felonies "subject the committers of them to forfeitures") (hereinafter "Blackstone"), *id.* at 18-19, (counting 160 acts to be "felonies without benefit of clergy," *i.e.* "worthy of instant death").   In Founding Era England, then, a citizen could potentially be disarmed for committing a crime (be it felony or misdemeanor), being a Catholic, being considered "disaffected and dangerous" by a lieutenant of the Militia, or by any act of Parliament.

-15-

Restrictions of firearm possession existed in Colonial America as well.  While religious tolerance was higher in the colonies, at least some scholars believe that certain colonies disarmed their Catholic population.  *See* Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: the Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (Virginia) (but explaining, "[i]n the one instance in which an American colonial government acted to disarm Catholics, it did so on the basis of allegiance, not on the basis of faith); Don B. Kates and Stephen P. Halbrook, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 n. 122 (citing Stephen A. Halbrook, <u>A Right to Bear Arms: State and Federal Bills of Rights and Constitutional Guarantees</u> 69-61 (1989)) (Maryland). It is apparently undisputed that other classes of early Americans, including Native Americans, free blacks, and those who refused to swear a loyalty oath, were often restricted from owning firearms. Malcolm, *supra* at 140 - 41; Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Towards and Afro-Americanist Reconstruction*, 80 Georgetown L.J. 309, 323-27 (1991); Saul Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999).  The practice of subjecting felons to literal or "civic" death – in which the person's legal existence was destroyed – continued in early America.  Pamela A. Wilkins, *The Mark of Caine: Disenfranchised Felons and the Constitutional No Man's Land,* 56 Syracuse L. Rev. 85, 132-33 (2005).  Based upon these and other regulations existing in Colonial era America, it is clear that the colonists, at least in some manner, carried on the English tradition of disarming those viewed as "disaffected and dangerous."

There is at least some evidence to suggest that at the time of enactment, our constitutional founders would have understood the Second Amendment right to keep and bear arms as limited to virtuous members of the body politic.  The strongest source of this understanding comes from proposals for the Second Amendment issued by various State conventions.  Although the final version of the Second Amendment, drafted by James Madison, seems far more succinct than most of these proposals, they are valuable in that they give a more detailed view of the right to bear arms as was understood prior to the enactment of the Second Amendment. They provide some understanding of the founders' view of this pre-existing right before it was codified, in addition to serving as "precursors" to the amendment itself. *Heller,* 128 S.Ct. at 2804.

One of these convention proposals – the Pennsylvania minority proposal, identified by Justice Scalia as "highly influential" – contained the following language:

> That the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; . . . .

The Address of Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787 reprinted in 2 Schwartz, The Bill of Rights, A Documentary History 665 (1971).  One reason for considering this proposal "highly influential," is that it represents the view of the Anti-federalists – the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights.  Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited – particularly from those who had committed crimes or were a danger to the public.

The Pennsylvania minority proposal was not unique in its view of a right limited to virtuous citizenry.   In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the Constitution be never construed to authorize Congress . . . . To prevent the people of the United States who are peaceable citizens, from keeping their own arms. *Heller*, 128 S.Ct. at 2783 (citing The Complete Bill of Rights 182-183 (N. Cogan ed. 1997)); *see also* 2 Schwartz *supra* at 674-75.  Though not identical to the Pennsylvania proposal, the one put forth by Samuel Adams carried similar limitations, that the right would only extend to citizens, and among them only those who were not a public or private danger.[6]

Acceptance of the "virtuous citizen" historical understanding of the right to firearms would explain why the Second Amendment itself does not contain specific exclusions to the right.  *See* Stephen P. Halbrook, The Founders' Second Amendment 273 (2008) (arguing that the Second Amendment did not need to contain "an explicit exclusion of criminals from the individual right to keep and bear arms [] because this . . .  was understood.") It would also be consistent with the understanding of other civic rights at the time of the founding.  In England, jurors could be excluded for misdemeanor crimes.  4 Blackstone 363-64.  In America, statutes defining the qualifications for jury service focused on character and moral qualities but did not distinguish between felony and misdemeanor crimes.  Brian Kalt, *The Exclusion of Felons from Jury Service* 53 Amer. U. L. Rev. 65, 178-79 & n. 544 (2003) (noting that "[a]t around 1800, statutory limits on jury service by felons

---

[6]The government's brief contains numerous contemporaneous definitions of "peaceable:" Samuel Johnson, Dictionary of the English Language (5th ed. 1773) ("1. Free from war; free from tumult; 2. Quiet; undisturbed; 3.  Not violent; not bloody; 4. Not quarrelsome; not turbulent"); T. Sheridan, A Complete Dictionary of the English Language (1796) ("Free from war; free from tumult"); Noah Webster, American Dictionary of the English Language (1828) (definitions include "free from private feuds and quarrels;" and "quiet, undisturbed, not agitated with passion").

per se were rare," and that "most states required that jurors be 'judicious' or 'of fair character,' or exhibit other criterion of moral quality"). In New England, "moral delinquencies" could result in disenfranchisement from certain civic rights – including the right to vote. Cortlandt F. Bishop, History of Elections in the American Colonies 53-56, 219-25 (1893). Some state constitutions even listed specific crimes which would lead to disenfranchisement, and these crimes were not limited to felonies. *See, e.g. , Borino v. General Registrars of Voters of City and Town of Bridgeport,* 86 A. 587 (Conn. 1913) (citing Conn. Const. Art. 6 & 3 ( "bribery, forgery, perjury, dueling, fraudulent bankruptcy, theft, or other offense for which an infamous punishment is inflicted")); *United States v. Block*, 24 F. Cas. 1174 (D. Ore. 1877) ("perjury, conspiracies, and other infamous crimes, were only misdemeanors at common law").

This virtuous citizen model of the right to arms has support among scholars. *See* Don B. Kates and Clayton E. Kramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L. J. 1339, 1359; Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004) ("Historians have long recognized that the Second Amendment was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue."); Robert E. Shallope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986) (quoting Seventeenth Century English sources for the proposition that arms should only be placed in the hands of those interested in preserving the "publick Peace"); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and Research Agenda*, 56 UCLA L. Rev. 1443, 1500 (2009) (recognizing that "some historical references say that the right to keep and bear arms encompassed only 'peaceable citizens' or 'virtuous citizens'"). Additionally, there are indications

within *Heller* that it is a view which could be supported by the opinion's author, Justice Scalia, if not the majority of the Court.  One implication of the virtuous citizen model is that the right does not preclude regulations which restrict possession of firearms by those who are unvirtuous (such as criminals) or those who are incapable of virtue in the classical sense of the word (such as children or the mentally incompetent).  Don B. Kates, Jr. *The Second Amendment: A Dialogue*, 49 Law & Contemporary Probs. 143, 146 (1986).  This view would explain the status based restrictions which Scalia deems "presumptively lawful" in *Heller* – those restrictions on felons and the mentally ill. (The other half of the "presumptively lawful" restrictions are time, place, and manner restrictions – in schools or government buildings.)  It would also explain Scalia's limitation on the "core" right of the Second Amendment to "law-abiding citizens."  *Heller*, 128 S.Ct. at 2815-16.  Acceptance of this view would not be unique among jurists. *See United States v. Rene E.* 583 F.3d 8, 15 (1st Cir. 2009) ("some evidence [exists] that the founding generation would have shared the view that public-safety-based [firearm] limitations . . . were consistent with the right to keep and bear arms . . . . [T]hese limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'").

Whether or not the virtuous citizens model ultimately becomes the prevailing view among historians and/or becomes accepted in American jurisprudence, a few important points are clear. First, and foremost, both in Colonial Era England and America the right to bear arms did not extend to all people.   These limitations on the right were often  based upon membership in a class perceived to be a public or private danger.   Those convicted of crimes were at risk of losing their rights – in the case of a felony, all civil rights; in England, and at least some states, the loss of civic rights as the result of a misdemeanor.

Considering the preceding historical analysis and the available guidance from *Heller*, the Court must conclude that Mr. Tooley's right to carry a firearm is within the scope of Second Amendment protection, but outside of its "core."  Mr. Tooley engaged in criminal acts, when he violated Ohio and West Virginia criminal codes defining domestic battery and second offense domestic battery.  As were the defendants in *Skoien* and *Chester,* he cannot be considered "law-abiding" because of his multiple prior misdemeanor convictions for domestic violence.  Moreover, each of these crimes contain as a requisite element the commission or threat of violence.  Mr. Tooley, therefore, is reasonably perceived as dangerous.  His actions certainly would not be considered "virtuous" by modern standards and not "peaceable" under any definition of the term.  He is  beyond  the *Heller* "core" Second Amendment right – that of a law-abiding citizen using a firearm for the defense of hearth and home.[7]  While constitutional review is necessary, something less than strict scrutiny is appropriate.

## II.     Intermediate Scrutiny is the Most Appropriate Level Upon Which to Analyze § 922(g)(9)

In choosing a level of constitutional scrutiny under which to analyze the deprivation of the right to keep and bear arms the *Skoien* court chose an intermediate level of scrutiny as enunciated in *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) – a case examining commercial-speech.  *Skoien*, 587 F.3d at 813.  This standard requires an exceedingly persuasive

---

[7]There was some dispute in oral argument about whether Mr. Tooley possessed his gun for self-defense in the home, because he pawned the gun shortly after transferring registration into his own name.  Despite this act, the Court considers self-protection, and indeed self-protection in the home as the defendant's primary purpose for owning the gun.  His intended use of the firearm therefore was within the *Heller*-defined "core" of the Second Amendment right, even though his status as a former domestic violence misdemeanant placed him outside of this "core."

-21-

government interest and "a fit between the legislature's ends and the means chosen to accomplish those ends, . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (quoting *Fox*, 42 U.S. at 480). The *Fox* standard which the Seventh Circuit Applied in *Skoien* will likewise be applied here.[8]

### A. The Prevention of Domestic Violence is a "Compelling" Governmental Interest

There can be little doubt that the government's interest in preventing domestic violence or lessening its severity is "exceedingly persuasive" as required by the test this Court has adopted for intermediate scrutiny. The Supreme Court has ruled in the past that protecting "the safety and indeed the lives of its citizens" is not merely "substantial" but "compelling." *United States v. Salerno*, 481 U.S. 739, 750, 754-55 (1987). A survey of 16,000 Americans released in July of 2000 reported that a staggering 22.1% of American women had been assaulted by an intimate partner at some point in their lifetime. United States Department of Justice, *Extent, Nature and Consequences*

---

[8]The defendant advocates for a different articulation of the First Amendment intermediate scrutiny test, articulated in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289-96 (2000). This is a more exacting test where four factors must be satisfied: 1) whether the government regulation is within the constitutional power of the government to enact; 2) whether the regulation furthers an important or substantial government interest; 3) that the government interest is unrelated to the suppression of free expression; and 4) that the restriction is no greater than is essential to the furtherance of the government interest identified. The main problem with this test is the third element. As the defendant suggests, the corresponding element in the Second Amendment context would be whether the government's interest is unrelated to the suppression of individual firearm possession for purposes of self-defense. The Court anticipates that this could cause many practical problems in application. While the First Amendment test generally will ensure that only content neutral regulations pass, it is hard to find an analogy for content neutral regulations in the Second Amendment context – the aim of every firearm restriction is to restrict a specific use of firearms. Focusing on self-defense is problematic because a firearm possessed for self-defense may also be used offensively. A person convicted of domestic violence, for example, cannot be limited to keeping a gun for self-defense and be practically expected to refrain from using that weapon should he or she engage in another violent domestic dispute.

*of Intimate Partner Violence*,11(2000)(NVWS Report),available at http://www.ncjrs.gov/pdffiles1/nij/181867.pdf. (last visited June 2, 2010).  The defendant, in fact, offers no argument and that the interest is anything less than compelling.

    B.    *Section 922(g)(9) is Reasonably Tailored to be Proportionate to the Interest Served*

    The Gun Control Act of 1968 was enacted "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency."  *Barrett v. United States*, 423 U.S. 212, 220 (1976) (quoting S. Rep. No. 90-1501 at 22 (1968)).  In other words, "Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Scarborough v. United States,* 431 U.S. 563, 572 (1977) (quoting 114 Cong. Rec. 14773 (1968)); *see also, United States v. Bass*, 404 U.S. 336, 345 (1971).  This goal was carried out in part by a proscribing firearm ownership to certain classes of individuals listed within § 922(g).  *United States v. Bass*, 404 U.S. 336, 345 (1971) (Congress' purpose in enacting § 922(g) was to keep firearms out of the hands of presumptively "risky people.").

    In 1996, Congress amended § 922(g) to include a prohibition on firearm possession on those who had been convicted of misdemeanor crimes of domestic violence.[9]  The amendment was based

_____

    [9]At one point in its brief, the government argues that this was not Congress's first act to disarm domestic violence  misdemeanants and provides several historical citations in support.  The Federal Firearms Act of 1938, c. 850, § 2(f) 52 Stat. 1250, made it unlawful for any person who had been convicted of a "crime of violence" to receive any firearm or ammunition that had been shipped or transported in interstate or foreign commerce.  The term "crime of violence" was defined as "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." *Id.* at § 1(6). Some of these offenses could be classified as misdemeanors under state law.  "[A]ssault with a dangerous weapon," for example was frequently only a misdemeanor offense.  *See e.g. State v. Broxton*, 177 So. 572 (La.
(continued...)

on the recognition that, because of the difficulty in proving felony domestic violence charges, particular crime was often under-charged or under-pled, and domestic violence consistent with the elements of a felony frequently resulted only in a misdemeanor plea or conviction.  142 Cong. Rec. S10377-01 (1996) ("many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies," but "are, at most convicted of a misdemeanor."); 142 Cong. Rec. S10377-78 ("violent acts classified as 'misdemeanors' in a domestic context would often 'be considered felonies, if committed by strangers'").  Aside from the difficulty of gaining a conviction, "[o]utdated or ineffective laws often treat domestic violence as a lesser offense."  *Id.* at. S10379-01, 10380.  By enacting § 922(g)(9) Congress sought to "close this dangerous loophole and keep guns away from violent individuals who threaten their own families."  *Id.* at. S8831-06. The prohibition was motivated, in part, by the view that "[d]omestic violence, no matter how it is labeled, leads to more domestic violence, and guns in the hands of convicted wife beaters leads to death."  *Id.* at S10377-01, 10378.  And to ensure that, if a person with a history of domestic abuse loses self-control again, "there will not be a gun" during "that moment of fleeting madness."  *Id.* at S11872, S11876.       These statements in the Congressional Record show that Congress anticipated a close fit between its interest in preventing domestic violence and reducing its severity.  Criminal justice

---

[9](...continued)
1937); In re: *Montgomery*, 57 S.E.2d 648, 649 (N.C. 1950); Ill Rev. Stats., Criminal Code ¶¶ 37, 614, 615 (1935); Florida Stats., Title 44, §§ 775.06, 775.08, 784.04 (1941); A Digest of the Statutes of Arkansas, Ch. 49, §§ 1631, 1632, 1672 (1916); 1935 Colo. St. Ann. Ch. 48., § 67.  It was not the only "crime[s] of violence" that was sometimes classified as a misdemeanor under state law. Georgia Ann. Code (1926), Penal Code § 2 (defining "felony"); §§ 67, 69 (involuntary manslaughter), §§ 86, 88, 89, 92; (mayhem offenses); § 178 (housebreaking); Revised Code of Delaware, Ch. 149, § 5161 (manslaughter involving adultery), § 5165 (maiming, i.e., mayhem) (1935); 1935 Colo. Stat. Ann. Ch. 48, § 57 (mayhem), § 78 (kidnaping by parents); Ann. Ind. Stats., Vol. I ch. 4 § 2027 (simple mayhem) (1926).

statistics and studies support the existence of such a close fit.  In debating the Interstate Stalking Punishment and Prevention Act, Senator Lautenberg relied on empirical evidence that each year over 150,000 incidents of domestic violence involve a gun.  142 Cong. Rec. S8831-06.  Acts of domestic violence committed with a firearm are twelve times more likely to result in the death of the victim than non-firearm related domestic violence incidents. Linda E. Saltzman, et al, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. of the Amer. Med. Ass'n 3043 (1992). According to the Bureau of Justice Statistics, in 2005, 678 women and 147 men were shot and killed by intimate partners in the United States.  Fox and Zawitz, *Homicide Trends in the United States*, Bureau of Justice Statistics (2007).

Intrafamily homicide is strongly correlated with domestic violence, and the presence of a gun surely increases the risk of a fatality.   In one study of homicides, "[a] history of domestic violence was present in 95.8% of the intrafamily homicides studied."  Kates and Kramer, *supra* at 1342 (citing Paige Hall-Smith et al, *Partner Homicide in Context*, 2 Homicide Stud. 400, 410 (1998)). Among all female homicides nationwide, between forty and fifty percent were committed by intimate partners.   Jacquelyn C. Campbell, et al.*, Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am. J. of Pub. Health 1089, 1089 (2003).  Indeed living with an abusive partner is a significant risk factor in predicting a woman's risk of femicide. *Id.* at 1090.  "Living in a household where someone had previously been hit or hurt in a fight in the home [is] strongly and independently associated with homicide." Arthur L. Kellerman, et. al, *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 The New England Journal of Medicine 1084 (1993).

Domestic violence offenders are also particularly prone to recidivism.  In a study conducted in Cincinnati, Ohio, relying on police statistics of 3,662 arrested for misdemeanor domestic violence, seventeen percent were re-arrested for domestic violence during the three-year study period alone. United States Department of Justice, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity, 6 (2001). This number is likely to be an under-representation of the actual number of cases of recidivism as domestic violence is widely believed to be under-reported.  *See* J.C. Babcock, et al., *Does Batterers' Treatment Work? A Meta-Analytical Review of Domestic Violence Treatment,* 23 Clinical Psychology Review 1023, 1039 (2004) (finding "the weighted percentage of nontreated offenders who recidivated was 21% based on police reports and 35% based on partner reports.").  Some studies that do not rely on police reports indicate rates of recidivism as high as forty percent to eighty percent, "when victims are followed longitudinally and interviewed directly."  Carla Stover, *Domestic Violence Research*: *What Have We Learned and Where Do We Go From Here*, 20 J. of Interpersonal Violence, 448, 450 (2005).

The defendant argues that § 922(g) is both overbroad and underinclusive in its approach to preventing and reducing the severity of domestic violence.  He points out that other weapons, such as knives, baseball bats, etc. will still be readily available and thus serious injury can still be inflicted.  He argues that § 922(g) applies to all firearms and not just a particularly dangerous class, such as handguns.  He argues that it is a complete ban in that it applies everywhere, not just in the home, and does not consider whether a firearm was used in the underlying act of domestic violence or in connection with the current partner of the misdemeanant.  Finally, and most strenuously, he

argues that the statue is overbroad because it operates as a permanent ban on firearms, unlike even convicted felons who may have their civil rights restored.

Even considering these objections to the breadth of the statute, the Court concludes that § 922(g)(9) is reasonably tailored in proportion to the important interest it attempts to further, especially considering the empirical evidence cited. The defendant's arguments that the statute bans all firearms but does not ban all weapons, may be dealt with rather quickly. While handguns, or other specific types of firearms may be considered, by some, a greater public danger because they are frequently the weapon of choice for criminals, nearly every type of firearm is designed to swiftly and effectively deliver lethal force. *See Heller*, 128 S.Ct. at 2856-57 ("In a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state inmates and 86.7% of federal inmates said they were armed with a handgun); *see* Model Penal Code § 3.11(2) ("Purposefully firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constituted deadly force."). Other weapons or household items are not so specifically designed. This is, after all, why a law-abiding citizen's right to possess a firearm for self-defense deserves clearly enumerated constitutional protection, while there is no corresponding guarantee of a law-abiding citizen's right to possess a knife or a baseball bat.

Limiting § 922(g)(9)'s restrictions to the home, to the specific partner, or to misdemeanants who used firearms in the underlying offense would not be practical and would reduce the effectiveness of the statute. First, it would be difficult, if not impossible, to enforce a restriction of firearms in the home that alternatively allowed the same person to own and possess a firearm elsewhere. Without careful tracking there would be little to prevent the firearm owner from taking his or her gun home. Additionally, possession of a firearm outside of the home or for purposes other

than self-defense in the home are not within the "core" of the Second Amendment right as defined by *Heller*.  Limiting the restriction to the time spent with a specific partner would lessen the protections offered by § 922(g)(9) and would essentially give the misdemeanant a new opportunity to commit an act of violence without risking deprivation of the right each time he or she entered a new relationship.  Finally, banning only those who used firearms previously fails to recognize that domestic violence is commonly a crime of passion (described by Senator Lautenberg as occurring within "a moment of fleeting madness") in which many abusers would use the weapon most readily available.  *See* Arthur L. Kellerman & Donald T. Reay, *Protection or Peril?: An Analysis of Firearm-Related Deaths in the Home*, 314 New Eng. J. Med. 1557, 1559 (1986).  Eliminating a firearm from the scene of a domestic violence incident helps ensure that the weapon available will not be deadly.

While the majority of domestic violence offenders may not regain their right to legally possess a firearm, the statute does contain procedures for the restoration of the right.  In this sense, it cannot  be considered a blanket permanent ban.   Pursuant to the definitions section,

> A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(33)(B)(ii).  Thus, there are three ways a domestic violence misdemeanant may regain the right to possess a firearm: 1) if their conviction is expunged or set aside; 2) if they are pardoned; or 3) if they have their civil rights restored.  As misdemeanor domestic violence is a state

charge,[10] it is up to state governments to put in place these mechanisms to the degree they deem appropriate. California is an example of a state with such procedures.   Cal. Penal Code § 12021(c)(3);

The defendant suggests that § 922(g)(9) could be tailored more narrowly by imposing a time-limitation on the deprivation of the defendant's Second Amendment right.  He suggests a scheme similar to that of domestic violence restraining orders – which can extended to over 180 days, in most states, to allow the domestic partners time to cool off. The problem with this proposal is that it does not account for the high rates of recidivism among domestic violence misdemeanants for periods well in excess of 180 days.  The studies attempting to quantify recidivism rates, cited above, look at statistics or follow victims for periods of at least three years.  The defendant himself went more than a year and a half between his second and third domestic violence convictions.  While limiting the deprivation of a Second Amendment right under § 922(g)(9) to a specific time period would more narrowly tailor the statute, it would also significantly lessen its effectiveness in furthering the Congressional purpose of preventing and reducing the severity of domestic violence.

Section 922(g)(9) is of course overbroad in the sense that not every domestic violence misdemeanant who loses his or her right to keep and bear arms would have misused them against a domestic partner or other family member.  Under intermediate scrutiny, however, the fit does not need to be perfect, but only be reasonably tailored in proportion to the important interest it attempts

---

[10]The crime of "Interstate domestic violence" is listed within the federal criminal code, but is a felony.  *See* 18 U.S.C. § 2261; 18 U.S.C. § 3559 (classifying as a felony any crime with a term of imprisonment over one year).

to further.[11]  As such, intermediate scrutiny tolerates laws that are somewhat overinclusive.  *See, e.g.*

*Fox.*, 492 U.S. at 490; *Anheuser-Bush, Inc. v. Schmoke*, 101 F.3d 325, 327-28 (4th Cir. 1996).

Moreover, "[s]ound policymaking often requires legislators to forecast future events and to

anticipate the likely impact of these events based on deductions and inferences for which complete

empirical support may be unavailable."  *Turner Broadcasting System, Inc. v. F.C.C.* 512 U.S. 622,

665 (1994).  This was certainly the case when Congress enacted § 922(g)(9) to help prevent and

reduce the severity of domestic violence.  In such instances, "Congress is far better equipped than

the judiciary to amass and evaluate the vast amounts of data bearing upon" a difficult and complex

issue.  *Id.* at 665-66.  These predictive judgments are due deference by the courts.  *Id.* at 665.

Section 922(g) furthers not only an exceedingly persuasive, but a compelling government

interest.  Preventing or reducing severity of domestic violence in our country is of the upmost

importance considering not only the prevalence of the problem, but the close link between domestic

abusers and relevant levels of risk for intrafamiliy homicide or femicide.  While it might be more

---

[11]Several courts reviewing § 922(g)(9) using the "sufficient analogy" approach to the *Heller* Court's presumptively lawful restriction of firearm possession by felons have found § 922(g)(9) to be more narrowly tailored than § 922(g)(1).  As explained by one district court,

> Although some felonies involve violence, countless felonies do not, and thus, a generic felony conviction would not necessarily predict future violence, with a firearm or otherwise.  Yet, all felons are constitutionally prohibited from possessing firearms. By contrast, those convicted of a misdemeanor crime of domestic assault have all been convicted of a crime that involves violence against a domestic victim.

*United States v. Pettengill*, 682 F.Supp.2d 49, 52-53 (D. Me. 2010).  While this Court rejects the sufficient analogy approach.  It agrees that § 922(g)(9) is in many ways more narrowly tailored than § 922(g)(1).

-30-

narrowly drafted, taking the defendant's suggestion and imposing a limiting time-frame would do harm to the congressional interest – as domestic violence offenders have been proven to have high rates of recidivism. The statute then is reasonably tailored considering the importance of the interest it furthers. The Court **FINDS** that, on the facts of this case, § 922(g)(9) passes constitutional muster. The defendant's challenge to Count II of his indictment fails. Insofar as his motion challenges this Count of the indictment, it is **DENIED.**

### III.     Title 18 U.S.C. § 924(a)(1)(A) Is Not Unconstitutional

The defendant also challenges his indictment, on Count I, pursuant to 18 U.S.C. § 924(a)(1)(A), which makes it a crime to knowingly make a false statement or representation with respect to information required to be kept in the records of licensed firearm dealers – including ATF Form 4473. He argues that if a prior misdemeanor conviction for domestic is not a constitutional basis for prohibiting the possession of firearms in the home, then there can be no legitimate basis for having a corresponding question on ATF From 4473, nor any criminal culpability based on how a person answers the question. He concedes, however, that his challenge to this count is premised on a finding that § 922(g)(9) is unconstitutional. As the Court has already found that § 922(g)(9) passes constitutional must, the defendant's challenge to Count I of the indictment must fail. For this reason his motion is **DENIED**.

**Conclusion**

For the reasons explained, the Court finds that the indictment charging the defendant with violations of 18 U.S.C. § 922(g)(9) and 18 U.S.C. § 924(a)(1)(A) is not defective. As such the Court **DENIES** the defendant's Motion to Dismiss (Doc. 20). The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        June 14, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE